### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND
#### (Northern Division)

| | | |
|---|---|---|
| CHRISTIAN ALEXIS, et al., | * | |
| Plaintiffs, | * | |
| v. | | Civil Action No. WDQ-02-2632 |
| | * | |
| BOARD OF EDUCATION OF | * | |
| BALTIMORE COUNTY, et al., | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### <u>MOTION FOR SUMMARY JUDGMENT</u>

The Board of Education of Baltimore County ("the Board") and Joe A. Hairston, Defendants, by Leslie R. Stellman, Eric W. Gunderson, and Hodes, Ulman, Pessin & Katz, P.A., their attorneys, and pursuant to the Federal Rules of Civil Procedure, move for summary judgment on each and every Count of the Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Complaint").  In support of their motion, and as more fully set forth in the accompanying Memorandum, Defendants state that:

1.      Summary judgment should be entered in Defendants' favor as to Count I of the Plaintiffs' Complaint, in which they seek relief under the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 <u>et seq.</u> ("IDEA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), and the Education Article of the Annotated Code of Maryland, <u>Md. Code Ann.</u>, Educ. § 8-401 <u>et seq.</u> ("Maryland Special Education Law") for the alleged failure of the Defendants to provide the Plaintiffs with a free and appropriate public education, since the undisputed facts support the findings of the Administrative Law Judge (ALJ) that (i) the Defendants complied with the procedural requirements of the IDEA in developing Plaintiff Christian Alexis' IEPs for the 1999-2000 and 2000-2001 school

years, and (ii) the January 2000 and January 2001 IEPs developed for Plaintiff Christian Alexis were reasonably calculated to enable him to received educational benefits.

2.      Summary judgment should be entered in Defendants' favor as to Count I of the Plaintiffs' Complaint, in which they seek relief under Section 1983 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983") for the alleged failure of the Defendants to provide the Plaintiffs with a free and appropriate public education, since the undisputed facts do not establish a violation of federal law.

3.      Summary judgment should be entered in Defendants' favor as to Counts II through VI[1] of the Plaintiffs' Complaint, in which they seek relief under the IDEA, Section 504, Section 1983, and the Maryland Special Education Law for the alleged errors committed by the ALJ in the course of presiding over the administrative due process hearing below, since the undisputed facts show that the ALJ did not err by finding that (i) the Defendants complied with the procedural requirements of the IDEA in developing Plaintiff Christian Alexis' IEPs for the 1999-2000 and 2000-2001 school years, and that (ii) the January 2000 and January 2001 IEPs developed for Plaintiff Christian Alexis were reasonably calculated to enable him to received educational benefits.

WHEREFORE, Defendants Board of Education of Baltimore County and Joe A. Hairston respectfully request that this Court enter summary judgment in their favor and dismiss, with prejudice, each of the Plaintiffs' claims asserted under the IDEA, Section 504, Section 1983, and the Maryland Special Education Law.

---

[1] The Plaintiffs' Complaint includes six Counts. However, the Plaintiffs mistakenly title the sixth Count as "Count V," when in fact it is the *sixth* Count of their Complaint. Accordingly, Defendants hereinafter will refer to this Count as "Count VI."

Respectfully submitted,


/s/

_____

Leslie Robert Stellman
Fed. Bar No. 1673
Hodes, Ulman, Pessin & Katz, P.A.
901 Dulaney Valley Road
Suite 400
Towson, Maryland 21204
410.938.8800
(signed by Eric W. Gunderson with
permission of Leslie R. Stellman)


/s/

_____

Eric W. Gunderson
Fed. Bar No. 26319
Hodes, Ulman, Pessin & Katz, P.A.
901 Dulaney Valley Road
Suite 400
Towson, Maryland 21204
410.938.8800

**ATTORNEYS FOR DEFENDANTS**

G:\files\ERIC\MABE\Alexis\Motion for Summary Judgment.doc

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | | |
|---|---|---|
| CHRISTIAN ALEXIS, et al., | * | |
| Plaintiffs, | * | |
| v. | | Civil Action No. WDQ-02-2632 |
| | * | |
| BOARD OF EDUCATION OF | | |
| BALTIMORE COUNTY, et al., | * | |
| Defendants. | * | |

*     *     *     *     *     *     *     *     *     *     *     *     *     *     *     *     *

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

The Board of Education of Baltimore County ("the Board") and Joe A. Hairston, Defendants, by

Leslie R. Stellman, Eric W. Gunderson, and Hodes, Ulman, Pessin & Katz, P.A., their attorneys, submit

this Memorandum in support of their Motion for Summary Judgment and state as follows:

## I.     STATEMENT OF FACTS[1]

1.     Plaintiff Christian Alexis ("Christian") began attending the Baltimore County Public

Schools ("BCPS") system at Rodgers Forge Elementary Schools ("Rodgers Forge") in the second grade

(1998-1999 school year) and he continued there through the beginning of the fifth grade.

2.     Christian received services from the reading specialist in the second and third grade and

tutoring from the Sylvan Learning Center. (BCPS-1)

---

[1] The Statement of Facts is essentially a reiteration of the Findings of Fact set forth by the Administrative Law Judge in her
written decision below. (See Decision of the ALJ, attached hereto as **Exhibit 1**).  Also, the exhibit references refer to the
exhibits admitted into evidence at the administrative hearing. (See Parents Exhibits 2-3, 5-7 and BCPS Exhibits 1-25,
attached hereto as **Exhibit 2**).  The transcript of the administrative hearing is attached hereto. (See Transcript of Hearing,
attached hereto as **Exhibit 3**).

3.      An Individualized Educational Plan ("IEP") team meeting was held on October 14, 1999, to update academic strengths and needs and to determine a need for special education assessment.

4.      Christian's Parents, Nancy Britos and William Alexis ("Christian's Parents"), were present at the October 14, 1999 meeting, as well as the IEP Chairperson, the School Psychologist, the Special Education Resource Teacher, the Reading Specialist, Christian's classroom teacher and the School Counselor. (BCPS-1)

5.      At the IEP team meeting, Christian's Parents were offered and accepted a Parental Rights Document. (BCPS-1 and BCPS-2)

6.      At the IEP meeting, Christian's teacher identified Christian's specific needs as decoding skills, written expression, individual and peer assistance, reading and spelling. The Reading Specialist, who had been working with Christian since the second grade, added that based on an informal reading inventory, Christian scored below pre-primer level. (BCPS-1)

7.      Based on the discussion at the IEP meeting, the following recommendations were made:

   a.  The classroom interventions and modification will continue.

   b.  The reading specialist will continue providing reading support services.

   c.  The school psychologist will complete cognitive testing and behavioral screening.

   d.  The special education resource teacher will complete an educational assessment.

   e.  The school counselor will complete a classroom observation.

   f.  The IEP Chairperson will discuss the possible need for receptive and expressive language testing with a speech/language pathologist.

8.      In a letter dated October 25, 1999, Christian's Parents requested that Christian be tested in the areas of expressive language and auditory processing. (Parent 7)

9.    On December 8, 1999, the IEP team met again. The following individuals were present at the meeting: Christian's Parents, the IEP Chairperson, the special education resource teacher, the school psychologist, Christian's classroom teacher, the reading specialist, the speech/language pathologist, and the school counselor.

10.    Christian's Parents declined another copy of the Parental Rights Document. (BCPS-3)

11.    An audiological report revealed that Christian's hearing was within normal limits bilaterally and speech discrimination in quiet and in the presence of background noise was excellent bilaterally. There were no audiologic recommendations. (BCPS-4)

12.    The educational assessment noted possible difficulties relative to inconsistent recall of vocabulary/word/finding/ language specificity, handwriting fluency, consistent sound/symbol relationships for spelling and decoding, and paper orientation and planning.  Strengths were seen in science, social studies, and writing composition except for spelling punctuation and capitalization accuracy. The assessor determined that Christian was performing at an average to above average level in broad knowledge; an average level in mathematics; an average level in written language and a low average in reading. The assessor also noted decoding difficulties throughout the assessment. The assessor further noted that, in the classroom, Christian would benefit from oral explanations with visual presentations, repetition and overlearning and an intensive remedial reading program. (BCPS-5)

13.    A BCPS Speech/Language Pathologist, Beth Adler, conducted a speech/language assessment using the Oral Written Language Scale (OWLS) on November 30, 1999. Christian was tested in the areas of listening comprehension, oral expression and social use of language.  Ms. Adler did not evaluate the areas of speech production that would have included articulation, auditory discrimination, oral mechanism, fluency, voice quality and overall intelligibility, or the area of written

language. In the areas of listening comprehension and oral expression, Ms. Adler found that Christian was within normal limits for his age.  She found that Christian demonstrated difficulties in word retrieval and recommended corrective strategies. Ms. Adler suggested vocabulary expansion activities such as word games like Hangman, Scrabble and Password; additional wait/response time; verbal cues; and open-ended questions.

14.     A psychological evaluation was conducted on November 17, 1999, November 18, 1999 and December 17, 1999. The evaluation measures used were record review, the Weschler Intelligence Scale for Children-Third Edition ("WISC-III), Wide Range Assessment of Memory and Learning ("WRAML"), the Beery Test of Visual Motor Integration, the Conners' Teacher Rating Scale and an interview with the Student. Based on the WISC-III test, Christian's cognitive abilities are in the high average range overall with verbal abilities in the high average range and visual- motor abilities in the average range. The WRAML results indicated that the Child is average to high average in the area of visual memory and high average range for memory and learning of sound-symbol associations. Christian's area of weakness was in short-term auditory memory. (BCPS-8)

15.     Based on the testing, the IEP team determined that Christian was learning disabled in the areas of perception and auditory memory. The team determined that the disorder resulted in severe discrepancies in the area of written language, basic reading and written expression. (BCPS-9)

16.     On January 13, 2000, the IEP team met to review, approve and sign the IEP that was drafted prior to the meeting. Present at the IEP meeting were Christian's Parents, the IEP Chairperson, the special education resource teacher, the school psychologist, Christian's classroom teacher, the reading specialist and the school counselor. A copy of the Parental Rights Document was offered and Christian's Parents declined the offer and initialed the receipt for rights paper. (BCPS-10).

17.    The IEP provided for 5 hours direct and 5 hours indirect special education services in the areas of reading and written expression to be delivered in a regular classroom. The current levels of educational performance listed on the IEP were based on testing performed on November 15, 1999. The Parent was in agreement with the goals and objectives listed on the IEP. (Parent 3)

18.    From January 2000 through June 2000, the special educator provided direct special education services to Christian. (Testimony of Reighart, **Exhibit 3**, pp. 330)

19.    Christian showed progress on his IEP goals and objectives during the third quarter of the 1999-2000 school year. The third quarter ended in March 2000. The comments written by the special educator were as follows:

> [Christian's] positive attitude and good effort continue to have an effect on his progress in written language, word analysis and fluency. With modification implemented in the general classroom for 1 hour per day for written language, 45 minutes a day in reading comprehension "Soar to Success" and three thirty minute individual intense lessons in decoding new words, [Christian] is filling in reading gaps and strengthening his auditory and visual memory for word patterns. He always completes his reading homework, as well!

(BCPS-21)

20.    Christian showed progress on his IEP goals and objectives during the fourth quarter of the 1999-2000 school year. (BCPS-22)

21.    During the 1999-2000 school year, Christian received a grade of C in his core subjects. (Testimony of Britos, **Exhibit 3**, pp. 267-269)

22.    Starting in September 2000 and continuing through January 2001, Christian received special education services from an instructional assistant who consulted with the special educator. (Testimony of Reighart, **Exhibit 3**, pp. 335-336, 379-381)

23.     During the 2000-2001 school, Christian's class size was 15 students and the class included a classroom teacher and an instructional assistant. (Testimony of Reighart, **Exhibit 3**, pp. 363, 381)

24.     Christian showed progress on his IEP goals and objectives during the first two quarters of the 2000-2001 school year. (BCPS-23; BCPS-24)

25.     As of January 11, 2001, Christian's teachers provided evaluations to the IEP team. Christian continued to exhibit poor visual memory, difficulty reading, poor letter formation in cursive handwriting, difficulty spelling and difficulty expressing his thoughts clearly on paper. (BCPS-12)

26.     An IEP meeting was held on January 11, 2001. Present at the meeting were Christian's Parents, the IEP chairperson, Christian's classroom teacher, the special resource teacher and the school counselor. Christian's Parents were offered another copy of the Parental Rights Document, declined the offer and signed the receipt for rights paper. An IEP was developed that provided for 7 hours of direct services and 5 hours of indirect special education services. The special education services were to be delivered in the regular classroom. The current levels of educational performance listed on the IEP were based on testing performed on November 15, 1999. The IEP listed classroom modification consisting of a teacher partner for paragraph and multi-paragraph reading, vocabulary lists, sequence charts, story maps, use of decoding and other reading strategies, graphic organizers, repetition of directions, extended time for processing, and modified tests and quizzes. The Parent was in agreement with the goals and objectives listed on the IEP. (BCPS-13)

27.     During the third and fourth quarter of the 2000-2001 school year, Christian did not exhibit progress in the IEP objective involving use of phonic and structural analysis to decode familiar words. (BCPS-24)

28.     Christian received private tutoring beginning July 2001 and private speech/language therapy beginning August 2001. The private tutoring continued until November 2001. (Testimony of Britos, **Exhibit 3**, pp. 228-229)

29.     In August 2001, Christian was evaluated by Elizabeth Sawyer, a private speech/language pathologist, at the Parent's expense. Dr. Sawyer used the following standardized tests: Test of Language Development-Intermediate: 3; Test of Work Knowledge; Clinical Evaluation of Language Fundamentals; Test of Auditory-Perceptional Skills-Revised; Test of Language Competence; and the Phonological Awareness Test. Dr. Sawyer found that Christian was below age expected in auditory memory skills, language memory skills, receptive and expressive syntax/grammar skills, phonemic awareness skills, auditory discrimination skills, and word retrieval/verbal formulation skills. She recommended that an audiologist who specializes in Central Auditory Processing Testing evaluate Christian's auditory discrimination skills. She further recommended that Christian participate in 2 to 3 forty- five- minute to sixty-minute speech/language therapy sessions per week with a certified speech/language pathologist. (BCPS- 14)

30.     The Parent provided a copy of Dr. Sawyer's report to BCPS in September 2001. (Testimony of Britos, **Exhibit 3**, pp. 196)

31.     Beginning in the 2001-2002 school year, Ms. Reighart stated providing direct one-to-one reading services to Christian using a multi-sensory approach ("Project Read"). The services were delivered for one hour each day to address Christian's lack of progress during the third and fourth quarter of the 2000-2001 school year. (Testimony of Reighart, **Exhibit 3**, pp. 364-365, 379-382)

32.     An IEP meeting was held on October 4, 2001.  Present at the IEP meeting were the following individuals: Christian's Parents, Dr. Elizabeth Lawrence, Holly Parker, Esquire, a paralegal

from BCPS, the Principal of Rodgers Forge, Christian's Classroom Teacher, the School Psychologist, a

BCPS Speech/Language Pathologist, the School Counselor, and the IEP Chairperson (BCPS-15)

33.     At the October 4, 2001 IEP meeting, Christian's Parents declined a copy of the Parental

Rights Document. (BCPS-15)

34.     Dr. Lawrence reported the results of her evaluation to the participants at the meeting.

The BCPS Speech/Language Pathologist, Ms. Nuckels, accepted the results of the private assessment

and noted that Ms. Reighart, the Resource Teacher, was addressing the recommendations specific to

reading and writing. Ms. Nuckels suggested that goals specific to oral verbal language be added to

Christian's IEP and that Christian be scheduled for services by her to address those goals. Ms. Nuckels

also noted that she spoke to Ms. Dolan, an audiologist for BCPS, who agreed to test for central auditory

processing if recommended by the IEP team. (BCPS-15)

35.     At the meeting, a new goal and short-term objectives were developed by Ms. Nuckels.

Dr. Lawrence found the new goal and short-term objectives appropriate.

36.     Christian's Parents signed permission for Ms. Dolan to complete the central auditory

processing ("CAPD") testing. (BCPS-16)  On the advice of counsel, Christian's Parents did not sign

permission for the three 30-minute speech/language sessions recommended by Ms. Nuckels. (BCPS-15;

Testimony of Nuckels, **Exhibit 3**, pp. 493; Testimony of Britos, **Exhibit 3**, pp. 209-210)

37.     On or about October 10, 2001, Ms. Dolan contacted Christian's Parents to schedule the

CAPD testing. After talking to Ms. Dolan, Christian's Parents revoked their permission for the CAPD

testing. Christian's Parents revoked their permission because the test conducted by the BCPS is a

screening test for CAPD called SCAN and she also had an October 16, 2001 appointment with Dr. Dana

Boatman, an audiologist at Johns Hopkins Hospital. The appointment with Dr. Boatman was made prior

to the October 4, 2001 IEP meeting. (BCPS-17; Testimony of Britos, **Exhibit 3**, pp. 224; Testimony of Dolan, **Exhibit 3**, pp. 577-578)

38.    The SCAN test consists of three one-half hour subtests. The CAPD testing performed by Dr. Boatman consisted of the SCAN test and a battery of 12 additional tests. (Testimony of Dolan, **Exhibit 3**, pp. 579-582)

39.    An IEP team meeting was scheduled for October 25, 2001. On October 24, 2001, the BCPS was advised that Christian's Parents would not be attending the meeting. (BCPS-18 and BCPS-19)

40.    On November 4, 2001, Christian was removed from BCPS and started attending the Lab School-Baltimore Campus (the "Lab School"), a private placement. All of the students at the Lab School are disabled. The IEP being used by the Lab School was the IEP developed by the BCPS in January 2001. At the Lab School, Christian received speech/language services for one hour a week and instruction using a multi-sensory approach. (Testimony of Britos, **Exhibit 3**, pp. 283-284; Testimony of Kane, **Exhibit 3**, pp. 304).

41.    On or about November 10, 2001, Christian's Parents filed a request with the Maryland Office of Administrative Hearings ("OAH") for a due process hearing to review whether BCPS met their obligation to provide Christian with a free and appropriate public education ("FAPE") for the 1999-2000, 2000-2001, and 2001-2002 school years. (BCPS-25).  Christian's parents sought placement and funding of Christian at his private educational placement and compensatory education[2] for the previous two school years.

---

[2] Compensatory education is a remedy occasionally awarded where it is found that a school district has failed to provide a child with a FAPE.  While a school district's obligation to provide special education services to a child ends when that child graduates from the public schools or reaches the age of 21, whichever comes first, compensatory education extends that obligation so that a child may recover for school years that were "lost" where FAPE was not provided.

42.     On December 19, 2001, and on January 14 and 15, 2002, a due process hearing was held before Sondra L. Spencer ("ALJ Spencer"), an Administrative Law Judge for OAH.  At the hearing both Christian's Parents and the Board had an opportunity to present testimony and other evidence in support of their respective claims and defenses.

43.     Christian's Parents contended that BCPS failed to provide Christian with FAPE, and based their contention on two grounds: (i) that BCPS failed to comply with the procedural requirements of the IDEA in developing Christian's IEPs for the 1999-2000 and 2000-2001 school years, and that (ii) the January 2000 and January 2001 IEPs developed for Christian were not reasonably calculated to enable him to received educational benefits.

44.     On February 14, 2002, ALJ Spencer issued her decision concluding that (i) the Defendants complied with the procedural requirements of the IDEA in developing Plaintiff Christian Alexis' IEPs for the 1999-2000 and 2000-2001 school years, and that (ii) the IEP developed for Plaintiff Christian Alexis for the 2001-2002 school year was reasonably calculated to enable him to received educational benefits.  Accordingly, ALJ Spencer denied Christian's Parents' request for funding at the Lab School.

45.     Following ALJ Spencer's decision, Christian and his parents filed the instant lawsuit.

## II.     **PROCEDURAL BACKGROUND**

The Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Complaint") contains six separate Counts.[3]  In Count I, Plaintiffs allege that the Defendants' failure to provide Plaintiff Christian Alexis with a free and appropriate public education violates their rights under the Individuals with Disabilities in Education Act, 20 U.S.C. § 1400 et seq. ("IDEA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"), Section 1983 of the Civil Rights Act of 1971, 42 U.S.C. § 1983 ("Section 1983"), and the Education Article of the Annotated Code of Maryland, Md. Code Ann., Educ. § 8-401 et seq. ("Maryland Special Education Law").  In Count II, the Plaintiffs allege that the failure of ALJ Spencer to rule in their favor and order funding at Christian's private educational placement violates the IDEA, Section 504, Section 1983 and the Maryland Special Education Law. Finally, in Counts III through VI, the Plaintiffs allege that ALJ Spencer committed errors in the course of presiding over the administrative due process hearing in violation of the IDEA, Section 504, Section 1983, and the Maryland Special Education Law.

Subsequent to the filing of the Plaintiffs' Complaint, Defendants filed an Answer and a motion to dismiss requesting that Count I, which contained four (4) different claims for relief, be dismissed, without prejudice, to allow the Plaintiffs to amend the Complaint to separate Count I into four different counts.  The Defendants also requested that Counts II through VI be dismissed, with prejudice, for failure to state any claim for relief since ALJ Spencer is not a person or local educational agency subject to the provisions of the IDEA, Section 504, Section 1983, or the Maryland Special Education Law.  On December 1, 2002, this Court denied the Defendants' motion to dismiss.

---

[3] The Plaintiffs' Complaint includes six Counts.  However, the Plaintiffs mistakenly title the sixth Count as "Count V," when in fact it is the ***sixth*** Count of their Complaint.  Accordingly, Defendants hereinafter will refer to this Count as "Count VI."

No discovery was conducted in the case on either side, and the discovery deadline has passed. Accordingly, this case is now ripe for summary judgment review.

## III.  STANDARD OF REVIEW

### A.  Summary Judgment

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes will demonstrate the absence of any genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Rule 56(c)).  Further, "the adverse party 'must set forth specific facts showing that there is a genuine issue for trial'." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986) (quoting Rule 56(e)).

In opposing summary judgment, non-movants must do more than present a mere scintilla of evidence in their favor. See Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999).  They must present sufficient evidence that reasonable jurors could find for them by a preponderance of the evidence. See Sylvia Dev. Corp. v. Calvert County, 48 F.3d 810, 817 (4th Cir. 1995).  In addition, the court has an affirmative obligation to prevent factually unsupported claims from proceeding to trial. See Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987).

### B.    Appeals of Administrative Decisions Pursuant to the IDEA and Section 504

It is well-settled that on an appeal from an administrative decision in an IDEA case, the district court is required to make an independent decision based on the preponderance of the evidence, but must give "due weight" to the administrative findings of the ALJ below and accept such findings as *prima facie* correct. See <u>S.M. v. Weast</u>, 240 F. Supp.2d 426, 432 (D. Md. 2003) (citing <u>School Comm. v. Dep't of Educ.</u>, 471 U.S. 359, 369 (1985) and <u>Kirkpatrick v. Lenoir County Bd. of Educ.</u>, 216 F.3d 380, 385 (4th Cir. 2000)); <u>Waller v. Board of Education of Prince George's County</u>, 234 F. Supp.2d 531, 536 (D. Md. 2002) (citing <u>Doyle v. Arlington County Sch. Bd.</u>, 953 F.2d 100, 103 (4th Cir. 1994)).  Accordingly, in the IDEA context, a motion for summary judgment is more aptly described as a motion for summary adjudication of the ALJ's findings. See <u>Hanson v. Smith</u>, 212 F. Supp.2d 474, 480-81 (D. Md. 2002).

In addition, because the administrative findings of the ALJ are to be accepted as *prima facie* correct,  "[t]he burden of proof when they challenge the presumed correctness of the ALJ's findings is upon the parents." <u>S.M.</u>, 240 F. Supp.2d at 432 (citing <u>Barnett v. Fairfax County Sch. Bd.</u>, 927 F.2d 146, 152 (4th Cir. 1991)).

**IV.   ARGUMENT**

    **A.   Summary Judgment Should Be Entered In Defendants' Favor As To The Plaintiffs' Claim Under The IDEA.**

       *1.   General Legal Standards Under the IDEA*

The Individuals with Disabilities Education Act ("IDEA"), requires "that all children with disabilities have available to them . . . a free appropriate education that emphasizes special education and related services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d).  The Act provides federal money to the states to educate disabled children on condition that states comply with the extensive goals and procedures of the Act. See 20 U.S.C. §§ 1412-1414; see also Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176 (1982).

A free appropriate public education ("FAPE") is, in part, furnished through the development and implementation of an individualized education program ("IEP") for each disabled child. See Rowley, 458 U.S. at 181-82.  An IEP is a program developed by the collaboration of a student's parents, teachers, and local school officials who set forth the special education needs of the student and the special education and related services to be provided to meet those needs. See Hanson, 212 F. Supp.2d at 481 (citing Cavanaugh v. Grasmick, 75 F. Supp.2d 446, 457 (D. Md. 1999)).  The goals, objectives, activities, and materials shall be adapted to the needs, interests, and abilities of each student. See 20 U.S.C. § 1414(d).  An IEP must be reasonably calculated to enable the child to receive educational benefits. See Rowley, 458 U.S. at 182.

While FAPE does not require "the best possible education that a school system could provide if given access to unlimited funds," Barnett v. Fairfax Co. Sch. Bd., 927 F.2d 146 (4th Cir. 1991), it does require the State to provide personalized instruction with sufficient support services to permit the disabled child to benefit educationally.  In turn, "educational benefit" has been construed to mean more

than trivial or *de minimis* educational progress. In Re Conklin, 946 18 F.2d 306 (4th Cir. 1991); see also Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171 (3rd Cir. 1988). The IDEA requires an IEP to provide a "basic floor of opportunity that access to special education and related services provides." Tice v. Botetourt County Sch. Bd., 908 F.2d 1200, 1207 (4th Cir. 1990). Nor is there a "requirement to guarantee any particular outcome for the child." King v. Board of Ed. of Allegany County, 999 F. Supp. 750, 767 (4th Cir. 1998).

In Rowley, the Supreme Court set forth a two-part analysis to determine whether a child is being accorded a free appropriate public education under the IDEA. First, a determination must be made whether there has been compliance with the procedures set forth in the IDEA. Second, a determination must be made whether the IEP, as developed through the required procedures, is reasonably calculated to enable the child to receive educational benefits. See Rowley, 458 U.S. 182. Once an IEP is shown to be procedurally proper, "a reviewing court should be reluctant to second-guess the judgment of the education professionals." Hanson, 212 F. Supp.2d at 481 (citing Tice, 908 F.2d at 1207); see also Waller, 234 F. Supp.2d at 536 ("In reviewing IDEA cases, a court must not 'substitute [its] own notions of sound educational policy for those of the school authorities.'") Courts have held that "[l]ocal educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment." Hartman v. Loudoun County Bd. of Educ., 118 F.3d 996, 1001 (4th Cir. 1997).

Parents who are not satisfied with their child's IEP have a right to an "impartial due process hearing," see Hanson, 212 F. Supp.2d at 483, which, in Maryland, is held before an ALJ at the Office of Administrative Hearings. See Md. Code Ann., Educ § 8-413. Parents have a further right to appeal a decision of the ALJ to federal court. See 20 U.S.C. § 1415(i)(2); Md. Code Ann., Educ § 8-413(h).

At the administrative hearing below, the Plaintiffs asserted that the Defendants failed to provide Christian with a FAPE in violation of federal and state law in two respects: (i) the Defendants failed to comply with the procedural requirements of the IDEA in developing Christian's IEPs for the 1999-2000 and 2000-2001 school years, and (ii) the January 2000 and January 2001 IEPs developed for Christian were not reasonably calculated to enable him to received educational benefits.  After both parties presented evidence on these issues, including the submission of thirty (30) exhibits and testimony from numerous witnesses, ALJ Spencer concluded that there were no procedural or substantive violations of the IDEA.

   2.   *The Alleged Procedural Violations – The December 1999 January 2001 IEPs*

At the hearing, the Plaintiffs asserted that the Defendants committed the following procedural violations:

   (1)   Violation of 34 C.F.R § 300.343[4] – No Speech/Language Pathologist was present at  the December 1999 IEP meeting and the Defendants failed to conduct appropriate testing.

   (2)   Violation of 34 C.F.R. § 300.344 – Christian's Parents did not receive a copy of their procedural rights.

   (3)   Violation of 34 C.F.R. § 300.343 – No Speech/Language Pathologist, no Audiologist, and no Psychologist was present at the January 2001 IEP meeting

   (4)   Violation of 34 C.F.R. § 300.347 – The December 1999 and January 2001 IEPs failed to reflect Christian's current levels of educational performance.

---

[4] The implementing regulations for the IDEA are found at 34 C.F.R. Part 300.

As for the Defendants' alleged procedural violations, ALJ Spencer did not agree. With regard to the contention that the Defendants failed to conduct appropriate testing, ALJ Spencer found that there was no requirement under federal law or regulation to conduct specific testing requested by a parent. (**Exhibit 1**, p. 20). Moreover, to the extent that a school is required to conduct a full initial evaluation to determine special education eligibility, ALJ Spencer found that a full evaluation was conducted by the Defendants, which included cognitive testing and behavioral screening, an educational assessment, a classroom observation, an audiological test, speech/language assessment, and a psychological evaluation. (**Exhibit 1**, p. 21).

With regard to the contention that a Speech/Language Pathologist was not present at the December 1999 IEP meeting, ALJ Spencer found that a review of the minutes of the meeting shows that Ms. Nuckels, a Speech/Language Pathologist, was present. (**Exhibit 1**, p. 22) With regard to the contention that a Speech/Language Pathologist, Audiologist, and Psychologist were not present at the January 2001 IEP meeting, ALJ Spencer noted that the law does not require such individuals to be present at IEP meetings and thus there was no violation. (**Exhibit 1**, p. 22).

With regard to the claim that Christian's Parents were not provided a copy of their procedural rights, ALJ Spencer found that a review of the minutes of the IEP meetings reflect that Christian's Parents were offered and accepted a "Parental Rights Document" at an IEP meeting in October 1999, and that at subsequent meetings they were offered and declined copies of the same document. (**Exhibit 1**, p. 22).

Finally, with regard to the contention that the December 1999 and January 2001 IEPs failed to contain a statement of Christian's current level of performance, ALJ Spencer found that in both cases the IEPs listed performance on tests performed in November 1999. (**Exhibit 1**, p. 22). Obviously, for

the December 1999 IEP, this testing reflected his "current" level of performance.  As for the January

2001 IEP, ALJ Spencer found that, to the extent that the testing done in November 1999 was not

"current," the IEPs included other information that reflected Christian's current performance.  This

included current evaluations from his teachers and progress reports for the first two quarters of the 2000-

2001 school year. (**Exhibit 1**, pp. 22-23).  Moreover, ALJ Spencer found that the Plaintiffs presented no

evidence that such procedural violation hindered their opportunity to participate in the IEP process or

caused a deprivation of Christian's educational benefits. (**Exhibit 1**, pp. 23). See <u>S.M.</u>, 240 F. Supp.2d

at 433-34 (finding that requirement that IEP contain statement of current level of performance was met

where parents were informed of grades and progress reports, and that any procedural violation in this

regard did not cause a loss of educational opportunity); <u>see</u> <u>also</u> <u>Hanson</u>, 212 F. Supp.2d at 485 ("To the

extent that a procedural violation does not actually interfere with the provision of a free appropriate

public education, such a violation is not sufficient to support a finding that [the school] failed to provide

a FAPE.")

       3.     *The Alleged Substantive Violations – The January 2000 and January 2001 IEPs*

At the administrative hearing, the Plaintiffs also asserted that beginning with the January 2000

IEP, Christian's educational program was not reasonably calculated to enable him to receive educational

benefits.  According to the Plaintiffs, the Defendants erred by not conducted a central auditory

processing (CAP) test and, thus, the IEP that was developed in January 2000 failed to address his needs

in the area of auditory processing.  However, ALJ Spencer found that the assessments and evaluations

performed by the Defendants prior to the January 2000 IEP could detect auditory processing difficulties.

(**Exhibit 1**, p. 24).  In fact, ALJ Spencer found that the testing did detect Christian's auditory processing

difficulties and that the January 2000 IEP was developed to address those difficulties. (**Exhibit 1**, p. 24).

ALJ Spencer noted that following the implementation of the January 2000 IEP, Christian showed actual progress during the third and fourth quarters of the 1999-2000 school year and continued to show actual progress in the first and second quarters of the 2000-2001 school year. (**Exhibit 1**, p 25). <u>See</u> <u>Waller</u>, 234 F. Supp.2d at 541 (noting that special education services "must be likely to produce progress" and that progress is measured by looking at "objective factors, such as actual educational progress, to avoid substituting the court's judgment for that of school authorities").

ALJ Spencer did note that in the third and fourth quarters of the 2000-2001 school year, Christian did not exhibit progress. (**Exhibit 1**, p. 25).  Nevertheless, ALJ Spencer found that the Defendants took immediate steps to address the lack of progress, including providing one-to-one services and offering to conduct CAP testing that would likely result in further modification to his IEP. (**Exhibit 1**, p. 25-27).  She further found that Christian's Parents refused to allow the Defendants to conduct the necessary testing and removed Christian from Rodgers Forge (and placed him at the Lab School) without giving the Defendants an opportunity to implement any changes to his IEP. (**Exhibit 1**, p. 27).

In short, ALJ Spencer found that the special education program offered by the Defendants was reasonably calculated to enable Christian to receive educational benefits and that he would have continued to make educational progress at Rodgers Forge had he not been removed.

4.    *Conclusion*

In sum, based upon the evidence presented before her, ALJ Spencer concluded that (i) the Defendants complied with the procedural requirements of the IDEA in developing Plaintiff Christian Alexis' IEPs for the 1999-2000 and 2000-2001 school years, and (ii) the January 2000 and January 2001 IEPs developed for Christian were reasonably calculated to enable him to receive educational benefits.

These findings were based on accurate statements of the law, well-reasoned, and thoroughly supported by the evidence.  Accordingly, given that ALJ Spencer's decision is entitled to *prima facie* correctness, summary judgment is appropriate and the Plaintiffs' claim under the IDEA should be dismissed.

**B.      The Defendants Are Similarly Entitled to Summary Judgment As To The Plaintiffs' Claim Under Section 504 and the Maryland Special Education Law.**

Because the Plaintiffs' Section 504 claim is identical to their IDEA claim, and because Defendants are entitled to summary judgment as to their IDEA claim, Defendants are also entitled to summary judgment as to the Plaintiffs' Section 504  claim. See Jones v. Board of Education of Washington County, 15 F. Supp.2d 783, 787 (D. Md. 1998) (citing Doe v. Alabama State Dep't of Educ., 915 F.2d 651, 666 (11th Cir. 1990) (finding that where plaintiff presented identical claims under the IDEA and Section 504, the Section 504 claim failed where the IDEA claim lacked merit).

The same is true with regard to the Plaintiffs' claim under the Maryland Special Education Law. Because the claims are identical, and because the Maryland Special Education Law expressly requires that any proceedings held pursuant to the statute and decisions resulting therefrom be in conformance with the IDEA, Defendants are also entitled to summary judgment as to the Plaintiffs' claim under that law as well. See Md. Code Ann., Educ. § 8-407.[5]

**C.      Summary Judgment Should Be Entered In Defendants' Favor As To The Plaintiffs' Claim Under Section 1983.**

Since it has been shown that the Plaintiffs are not entitled to relief under either the IDEA or Section 504, the Plaintiffs' claim under Section 1983 should similarly be dismissed since Section 1983 is simply a vehicle for asserting violations of federal statutes and does not, in and of itself, provide for a

---

[5] Alternatively, because no federal claims remain, this Court is free to decline to exercise supplemental jurisdiction over the Plaintiffs' claim under the Maryland Special Education Law and can therefore dismiss it. See Jones, 15 F. Supp.2d at 787 (declining to exercise supplemental jurisdiction over claim brought under Maryland's special education law after dismissing all federal special education claims).

separate claim for relief. See Jones, 15 F. Supp.2d at 787 (citing Clark v. Link, 855 F.2d 156, 161 (4th

Cir. 1988) (dismissing Section 1983 claim after finding that plaintiff was not entitled to recover under

either the IDEA or Section 504); see also Albright v. Oliver, 510 U.S. 266, 271 (1994) (recognizing that

Section 1983 is not itself a source of substantive rights, but rather provides a remedy for deprivation of

rights conferred in the Constitution or another federal law).

      **E.**    **Summary Judgment Should Be Entered In the Defendants' Favor Since The Undisputed Facts Show That ALJ Spencer Did Not Err In Her Findings.**

As stated earlier, Counts II through VI seek relief as a result of the ALJ's failure to enter an order

in favor of the Plaintiffs and her failure to review certain evidence and issues while presiding over the

due process hearing.  Specifically, the Plaintiffs not only assert that the ALJ's failure to order funding

for the private educational placement violated the IDEA, Section 504, Section 1983, and the Maryland

Special Education Law (Count II), but that the ALJ's failure to accept relevant evidence and testimony

(Count III), determine all the issues presented (Count IV), apply applicable law and facts (Count V), and

afford the Plaintiffs due process of law (Count VI), violated these laws as well.  As a matter of law,

however, it cannot be that the ***ALJ's*** acts or omissions violated either the IDEA, Section 504, Section

1983, or Maryland Special Education Law because the ALJ is not subject to the provisions of those

statutes.

The IDEA, for example, imposes requirements upon a "state educational agency" and a "local

educational agency" which receives federal financial assistance under the Act in order to provide

educational services to students with disabilities. See 20 U.S.C. §§ 1401, 1413-1415 (emphasis added).

Section 504 imposes requirements upon "any program or activity receiving Federal financial assistance"

in providing services and benefits to individuals with disabilities. See 29 U.S.C.§ 794 (emphasis added).

The Maryland Special Education Law imposes obligations upon each "local school system" to provide

24

appropriate educational services to students with disabilities. See Md. Code Ann., Educ. § 8-403 (emphasis added). Clearly, ALJ Spencer is not a "state educational agency," "local educational agency," "program or activity receiving Federal financial assistance," or "local school system." Therefore, as a matter of law, it cannot be that the ALJ's acts or omissions violated any of these statutes, as the Plaintiffs have erroneously pled in their Complaint.[6]

Moreover, to the extent that the Plaintiffs are simply contending that ALJ Spencer erred in her findings, the record below and the case law clearly supports a finding here that she did not err in concluding that the Defendants provided Christian with a FAPE. (See Section IV.A., infra).

## V.     CONCLUSION

Defendants Board of Education of Baltimore County and Joe A. Hairston respectfully request that this Court enter summary judgment in their favor and dismiss, with prejudice, each of the Plaintiffs' claims asserted under the IDEA, Section 504, Section 1983, and the Maryland Special Education Law.

---

[6]     While it is true that the ALJ is a "person" subject to the provisions of Section 1983, the ALJ's alleged acts or omissions still could not have violated the Plaintiffs' rights under Section 1983, as a matter of law, since the ALJ's alleged acts or omissions did not violate the Plaintiffs' rights under the IDEA, Section 504, or any other Federal law. See 42 U.S.C. § 1983 (providing relief to individuals against any "person" who has deprived them of their rights "secured by the Constitution and laws."); see also Albright v. Oliver, 510 U.S. 266, 271 (1994) (recognizing that Section 1983 is not itself a source of substantive rights, but rather provides a remedy for deprivation of rights conferred in the Constitution or another federal law).

Respectfully submitted,


/s/
_____

Leslie Robert Stellman
Fed. Bar No. 1673
Hodes, Ulman, Pessin & Katz, P.A.
901 Dulaney Valley Road
Suite 400
Towson, Maryland 21204
410.938.8800
(signed by Eric W. Gunderson with
permission of Leslie R. Stellman)


/s/
_____

Eric W. Gunderson
Fed. Bar No. 26319
Hodes, Ulman, Pessin & Katz, P.A.
901 Dulaney Valley Road
Suite 400
Towson, Maryland 21204
410.938.8800

**ATTORNEYS FOR DEFENDANTS**

G:\files\ERIC\MABE\Alexis\Motion for Summary Judgment.doc